# EXHIBIT 1

EFiled: Sep 03 2024 04:41PM EDT
Transaction ID 74217935
Case No. N24C-09-014 CEB

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN HARRISON, | * | C.A. No. _____ |
| | * | |
| *Plaintiff*, | * | |
| | * | |
| v. | * | |
| | * | |
| ARCTIC GLACIER U.S.A., INC., | * | |
| | * | |
| *Defendant*. | * | |
| | * | |

## COMPLAINT

---

COMES NOW, Plaintiff John Harrison, by and through his undersigned counsel, bringing this Complaint against Defendant Arctic Glacier U.S.A., Inc., alleging as follows:

### FACTS

### Parties

1. Plaintiff John Harrison ("Harrison" or "Plaintiff") is an adult individual and resident of New Hampshire. Harrison may be contacted through his undersigned counsel.

2. Defendant Arctic Glacier U.S.A., Inc. ("Arctic" or "Defendant") is a corporation organized in and pursuant to the laws of the State of Delaware. Arctic's registered agent is The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

1

**Jurisdiction and Venue**

3.  This Court has jurisdiction over – and venue is proper concerning – the parties and the claims asserted herein as Arctic is a corporation organized and domiciled in the State of Delaware.  Further, Paragraph 22 of the parties' March 16, 2020 Employment Agreement (the "Employment Agreement") (attached hereto as **Exhibit A**), mandates that this action be brought in Delaware.

**Common Allegations of Fact**

4.  Arctic employed Harrison from in or around July 2019 through April 30, 2024, during which Harrison served as Region President and Chief Operating Officer.

5.  In March 2020, the two executed the Employment Agreement.

6.  Pursuant to the Employment Agreement, Arctic had the option to terminate Harrison without "Cause", a defined term.  Should Arctic do so, the Employment Agreement obligated it to pay Harrison the "Severance Benefits", which are 12 months' salary, a cash bonus equal to the bonus Arctic paid Harrison for the preceding fiscal year, and a prorated annual bonus for the year in which Arctic terminated Harrison's employment without Cause.

7.  The Employment Agreement also afforded Harrison the option to resign his employment with "Good Reason", a defined term.  Should Harrison do so, the

Employment Agreement also obligated Arctic to provide Harrison the Severance Benefits.

8.  In or around January 2024, Arctic's CEO communicated to Harrison that he will be reducing certain of Harrison's duties and responsibilities.

9.  Arctic's CEO carried out this decision in or around that time and through March 2024, when Arctic's CEO informed Harrison that he would be hiring a new Chief Commercial Officer that would be taking over certain of Harrison's duties and responsibilities.

10. On or about April 4, 2024, Harrison had a discussion with Arctic's CEO regarding the diminution of his duties and responsibilities.  Harrison brought up his ability to resign with Good Reason, but expressed his desire to come to a mutual agreement as he believed Arctic was preparing to terminate his employment.

11. Harrison sent the email attached hereto as **Exhibit B** to Arctic's CEO after their April 4, 2024 discussion.

12. On or about April 16, 2024, Harrison had a follow up discussion with Arctic's CEO and Chief Human Resources Officer ("CHRO").  Arctic took the position that grounds for Harrison to resign with Good Reason did not exist.  Harrison informed the two that he disagreed, mentioning he had counsel opine on the same.  Arctic then asserted that they needed to discuss Harrison's resignation, to which Harrison

responded he has not resigned and had not provided the requisite notice for the same. Arctic responded that it would discuss the issue and get back to Harrison.

13. On April 18, 2024, Harrison wrote the email attached hereto as **Exhibit C** to Arctic's CEO. As can be seen therein, Harrison sought to clarify the notice requirements of the Employment Agreement, which are found within paragraph 17. Because Harrison and Arctic had yet to come to an agreement regarding Harrison's resignation with Good Reason, Harrison was preparing to provide notice of his resignation with Good Reason pursuant to paragraph 17 of the Employment Agreement.

14. On or about April 19, 2024, Harrison again spoke with Arctic's CEO and CHRO. Arctic informed Harrison that they were accepting his resignation (despite it never being tendered) and that Harrison's last day would be April 30, 2024. Arctic provided Harrison with a proposed severance agreement that offered him substantially less than the Severance Benefits (also proposing more restrictive covenants).

15. Harrison did not resign and never agreed to resign, nor did he provide Arctic notice of resignation pursuant to the Employment Agreement or otherwise. Instead, as is detailed herein, Harrison communicated that he planned to provide notice of his intent to resign with Good Reason.

16. Harrison did not sign or otherwise agree to the Arctic's proposed severance agreement that offered him substantially less than the Severance Benefits.

17. Arctic terminated Harrison's employment without Cause as a result.

18. However, since Arctic terminated Harrison's employment without Cause, Arctic continues to take the false position that Harrison resigned without Good Reason.

19. Arctic has refused to provide Harrison the Severance Benefits.

## COUNT 1:  BREACH OF THE EMPLOYMENT AGREEMENT

20. Harrison re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with this cause of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

21. As is detailed herein, Arctic terminated Harrison's employment without Cause.

22. Arctic has refused to provide Harrison with the Severance Benefits.

23. As a direct and proximate cause, Plaintiff has suffered damages, including but not limited to the Severance Benefits.

## COUNT 2:  DECLARATORY JUDGMENT THAT ARCTIC TERMINATED HARRISON'S EMPLOYMENT WITHOUT CAUSE

24. Harrison re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with this cause of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

25. Whether or not Arctic terminated Harrison's employment without Cause is an actual controversy between the parties and affects the legal rights of both parties, including but not limited to whether Arctic owes Harrison the Severance Benefits.

26. The controversy is real and adverse between the parties, and it is ripe for adjudication as a result of Arctic taking the unequivocal position that Harrison resigned without Good Reason.

27. Harrison seeks Declaratory Judgment that his employment with Arctic was terminated without Cause (as opposed to Harrison having resigned without Good Reason).

### **Prayer for Relief**

WHEREFORE, Harrison prays for judgment and damages against Arctic as follows:

A.    Award Harrison the Severance Benefits;

B.    Declaratory Judgment that Arctic terminated Harrison's employment

without Cause;

C.    Award Harrison his reasonable litigation costs;

D.    Award Harrison any other damages or losses he has suffered related to

Arctic's conduct as is described in this Complaint;

E.    Award Harrison pre and post judgment interest; and

F.    Award Harrison such other relief as this Court deems just and equitable.


Respectfully,

**LAW OFFICE OF
DANIEL C. HERR LLC**

Dated:  September 3, 2024          */s/Daniel C. Herr*
                                   Daniel C. Herr (No. 5497)
                                   3411 Silverside Road
                                   The Baynard Building
                                   Wilmington, DE 19810
                                   dherr@dherrlaw.com
                                   *Attorney for Harrison*

7

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

EFiled: Sep 03 2024 04:41PM EDT
Transaction ID 74217935
Case No. N24C-09-014 CEB

COUNTY:   (N)   K   S          CIVIL ACTION NUMBER: _____

| | |
|---|---|
| Caption:<br>John Harrison v. Arctic Glacier U.S.A., Inc.<br><br>_____<br>_____<br><br>_____<br><br>_____ | Civil Case Code: CDBT<br>_____<br>Civil Case Type: Breach of Contract/Debt<br>_____<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION (MNA) N<br>_____<br><br>Name and Status of Party filing document:<br>John Harrison, Plaintiff<br>_____<br><br>Document Type:(E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br>Complaint<br>_____<br><br>JURY DEMAND:  YES _____   No X_____ |

| | |
|---|---|
| ATTORNEY NAME(S):<br>Daniel C. Herr<br>_____<br>ATTORNEY ID(S):<br>5497<br>_____<br>FIRM NAME:<br>Law Office of Daniel C. Herr LLC<br>_____<br>ADDRESS:<br>3411 Silverside Rd., The Baynanrd Bldg.<br>_____<br>Wilmington, DE 19810<br>_____<br>TELEPHONE NUMBER:<br>302-483-7060<br>_____<br>FAX NUMBER:<br>302-483-7065<br>_____<br>E-MAIL ADDRESS:<br>dherr@dherrlaw.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br><br>_____<br><br>_____<br>EXPLAIN THE RELATIONSHIP(S):<br><br>_____<br><br>_____<br><br>_____<br><br>_____<br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>_____<br><br>_____<br><br>_____<br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED.  THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 12/17

EFiled:  Sep 03 2024 04:41PM EDT
Transaction ID 74217935
Case No. N24C-09-014 CEB

# EXHIBIT A

## EMPLOYMENT AGREEMENT

### Revised March 16, 2020

This EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of this 20th day of June, 2019, by and between Arctic Glacier U.S.A., Inc. (the "Company") and John Harrison (the "Executive"). The "Effective Date" of this Agreement shall be July 8, 2019; provided that if the Executive does not commence employment with the Company on the Effective Date, this Agreement shall be null and void *ab initio* and of no force and effect.

### RECITALS

WHEREAS, the Company desires to employ the Executive as Regional President of the Company and Arctic Glacier Canada Inc., and the Executive desires to be so employed on the terms and conditions set forth in this Agreement.

In consideration of the foregoing premises and the mutual promises, terms, provisions and conditions set forth in this Agreement, the parties hereby agree:

1.     Employment. Subject to the terms and conditions set forth in this Agreement, the Company hereby offers and the Executive hereby accepts employment as Regional President of each of the Company, Chill Holdings, Inc. ("Holdings") and all of the direct and indirect subsidiaries of Holdings (including, without limitation, Arctic Glacier Canada, Inc.).

2.     Term. This Agreement will commence on the Effective Date and continue in effect until terminated in accordance with Section 5. The term of this Agreement is hereafter referred to as "the term of this Agreement" or "the term hereof."

3.     Capacity and Performance.

(a)     During the term hereof, the Executive shall serve as the Regional President of each of the Company, Holdings and all of the direct and indirect subsidiaries of Holdings (including, without limitation, Arctic Glacier Canada, Inc.). In addition, and without further compensation, the Executive shall serve as a director and/or officer of one or more of the Company's other Affiliates if so elected or appointed from time to time.

(b)     During the term hereof, the Executive shall be employed by the Company on a full-time basis and shall perform the duties and responsibilities of his position and such other duties and responsibilities on behalf of the Company and its Affiliates as reasonably may be designated from time to time by the Company's Chief Executive Officer or the Board of Directors of Holdings (the "Board") or its designees.

(c)     During the term hereof, the Executive shall devote his full business time and his best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of the Company and its Affiliates and to the discharge of his duties and responsibilities hereunder. The Executive shall not engage in any other business activity or serve in any industry, trade, professional, governmental or academic position during the term of this Agreement, except as may be expressly approved in advance by the Board in writing, and provided

that any such activity or activities do not, individually or in the aggregate, interfere with the performance of the Executive's duties under this Agreement or violate Sections 7, 8 or 9 of this Agreement.

(d)    During the term hereof, the Executive shall comply with all Company policies, practices and procedures and all codes of ethics or business conduct applicable to the Executive's position, as in effect from time to time.

4.    <u>Compensation and Benefits</u>. As compensation for all services performed by the Executive hereunder during the term hereof, and subject to the performance of the Executive's duties and responsibilities to the Company and its Affiliates, pursuant to this Agreement or otherwise:

(a)    <u>Base Salary</u>. During the term of this Agreement, the Company shall pay the Executive a base salary at the rate of Two Hundred and Twenty Thousand Dollars ($220,000) per year, payable in accordance with the normal payroll practices of the Company for its executives as in effect from time to time. The Executive's base salary shall be subject to annual review by the Board (or a committee or designee thereof) as part of its merit-based review process. Such base salary, as from time to time adjusted, is hereafter referred to as the "<u>Base Salary</u>."

(b)    <u>Management Incentive Plan</u>. For each fiscal year completed during the term hereof, the Executive shall be eligible to earn a bonus determined by the Board (or a committee thereof) in accordance with this Section 4(b). The Executive's target annual bonus shall be equal to fifty percent (50%) of Base Salary (the "<u>Target Bonus</u>"), with the actual amount of the annual bonus, if any, to be determined by the Board (or a committee thereof) based on performance objectives established annually by the Board. In order to receive an annual bonus under this Section 4(b) for any fiscal year, the Executive must be actively employed by the Company (excluding any notice period) on the last day of such fiscal year. For greater certainty, other than as specifically provided in Section 5 hereof, no period of notice or pay in lieu thereof that is given or that ought to have been given in respect of any termination of employment will be utilized in determining the Executive's entitlement to a bonus payment. Any annual bonus earned by the Executive hereunder will be paid during the fiscal year following the fiscal year for which the annual bonus is earned, at such time when bonuses are payable to executives of the Company generally. Notwithstanding anything to the contrary in the foregoing, for fiscal year 2019, the Executive's Annual Bonus shall be at least Forty Thousand Seven Dollars ($40,007)and shall be paid in accordance with the schedule set forth above, subject to his continued employment with the Company through December 31, 2019, unless the Executive's employment is earlier terminated by the Company without Cause or by the Executive for Good Reason.

(c)    <u>Vacations</u>. During the term hereof, the Executive shall be entitled to four (4) weeks of vacation per annum, to be taken at such times and intervals as shall be determined by the Executive, subject to the reasonable business needs of the Company. Vacation shall otherwise be governed by the policies of the Company, as in effect from time to time.

(d)    <u>Employee Benefit Plans</u>. During the term hereof and subject to any contribution therefor generally required of employees of the Company, the Executive shall be entitled to participate in any and all Employee Benefit Plans from time to time in effect for

2

employees of the Company generally, except to the extent any Employee Benefit Plan provides for benefits otherwise provided to the Executive hereunder (e.g., a severance pay plan). Such participation shall be subject to (i) the terms of the applicable plan documents, (ii) generally applicable Company policies and (iii) the discretion of the Board of Directors of the Company or any administrative or other committee provided for under or contemplated by such plan. The Executive shall have no recourse against the Company under this Agreement in the event that the Company should alter, modify, add to or eliminate any or all of its Employee Benefit Plans. For purposes of this Agreement, "Employee Benefit Plan" shall have the meaning ascribed to such term in Section 3(3) of ERISA, as amended from time to time.

(e)     Business Expenses. The Company shall pay or reimburse the Executive for reasonable, customary and necessary business expenses incurred or paid by the Executive in the performance of his duties and responsibilities hereunder, subject to travel and other policies and such reasonable substantiation and documentation as may be required by the Company from time to time.

(f)     Car Allowance. During the term of this Agreement, the Company shall pay the Executive an automobile stipend of $8,000 per year, payable in accordance with the normal payroll practices of the Company for its executives as in effect from time to time.

(h)     Equity. Upon or as soon as practicable after the Effective Date, Holdings will grant stock options to the Executive pursuant to the Award Agreement in the form attached hereto as Exhibit A.

5.     Termination of Employment and Severance Benefits. The Executive's employment hereunder shall terminate under the following circumstances:

(a)     Death. In the event of the Executive's death during the term hereof, the date of death shall be the date of termination, and the Company shall pay or provide to the Executive's designated beneficiary or, if no beneficiary has been designated by the Executive in a notice received by the Company, to his estate: (i) any Base Salary earned but not paid through the date of termination, (ii) pay for any vacation time earned but not used through the date of termination, (iii) subject to the timing rules of Section 4(b) above, any annual bonus compensation awarded for the fiscal year preceding that in which termination occurs, but unpaid as of the date of termination, and (iv) any business expenses incurred by the Executive but unreimbursed on the date of termination, provided that such expenses and required substantiation and documentation are submitted within sixty (60) days following termination, and that such expenses are reimbursable under Company policy, and that any such expenses subject to Section 5(g)(iv) shall be paid not later than the deadline specified therein (all of the foregoing, payable subject to the timing limitations described herein, "Final Compensation"). In addition to the Final Compensation, the Company shall pay the Executive's estate a prorated annual bonus, if any, for the period during the year of termination during which the Executive remained employed, in an amount determined by the Board in accordance with Section 4(b) pursuant to the applicable bonus plan. Other than business expenses described in Section 5(a)(iv), Final Compensation shall be paid to the Executive's estate within thirty (30) days following the date of his death. Any prorated bonus described above shall be payable to the Executive's estate at such time when bonuses are payable

to executives of the Company generally. The Company shall have no further obligation or liability to the Executive or his estate.

(b)    Disability.

(i)    The Company may terminate the Executive's employment hereunder, upon notice to the Executive, in the event that the Executive becomes disabled during his employment hereunder through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, is unable to perform substantially all of his duties and responsibilities hereunder (notwithstanding the provision of any reasonable accommodation) for one hundred and eighty (180) consecutive days or an aggregate of two hundred and seventy (270) days during any period of three hundred and sixty-five (365) consecutive calendar days. In the event of such termination, the Company shall (A) pay the Executive any Final Compensation due; (B) pay the Executive a prorated annual bonus, if any, for the period during the year of termination during which the Executive remained employed, in an amount determined by the Board in accordance with Section 4(b) pursuant to the applicable bonus plan.  Other than business expenses described in Section 5(a)(iv), Final Compensation shall be paid to the Executive within thirty (30) days following the date of termination of employment. Any prorated bonus described in Section 5(b)(i)(B) shall be payable at such time when bonuses are payable to executives of the Company generally. The Company shall have no further obligation or liability to the Executive.

(ii)    The Board may designate another employee to act in the Executive's place during any period of the Executive's disability. If any question shall arise as to whether the Executive is disabled through any illness, injury, accident or condition of either a physical or psychological nature so as to be unable to perform substantially all of his duties and responsibilities hereunder, the determination of disability will be based on the written opinion of the physician regularly attending the Executive. If the Company disagrees with the opinion of such physician (the "First Physician"), the Company may engage at its expense another physician (the "Second Physician") to examine the Executive. The Second Physician shall confer with the First Physician and, if they together agree in writing that the Executive is or is not disabled, their written opinion shall be conclusive as to such disability. If the First and Second Physicians do not agree, they shall together choose a third consulting physician (the expense of which shall be borne by Company), and the written opinion of a majority of these three (3) physicians shall be conclusive as to such disability. If such question shall arise and the Executive shall fail to submit to such medical examination, the Company's determination of the issue shall be binding on the Executive.

(c)    By the Company for Cause. The Company may terminate the Executive's employment hereunder for Cause at any time upon notice to the Executive setting forth in reasonable detail the nature of such Cause. The following, as determined by the Board in its reasonable judgment, shall constitute Cause for termination:

(i)    The Executive's material breach of any of the terms of this Agreement or any other written agreement between the Company or any of its Affiliates and the Executive, provided that, if such material breach is capable of cure, the Executive has received notice from the Company as to such material breach on the part of the Executive and the Executive fails to cure such breach within five (5) days of receiving such notice, and provided, further, that

4

the Company will not have to provide more than one notice and opportunity to cure with respect to any multiple, repeated, related or substantially similar breach;

        (ii)    The Executive's commission of (A) a felony or (B) any other crime involving theft, fraud or moral turpitude;

        (iii)    The Executive's substantial failure to perform, or the Executive's substantial negligence in the performance of, his duties and responsibilities hereunder, provided that the Executive has received notice from the Company as to such failure or negligence on the part of the Executive and the Executive fails to cure such failure or negligence within five (5) days of receiving such notice, and provided, further, that the Company will not have to provide more than one notice and opportunity to cure with respect to any multiple, repeated, related or substantially similar events or circumstances;

        (iv)    The Executive's act or omission in the course of employment which constitutes intentional misconduct or a knowing violation of law; or

        (v)    The Executive's fraud, embezzlement, theft or other material dishonesty with respect to the Company or any of its Affiliates.

Upon the giving of notice of termination of the Executive's employment hereunder for Cause, the Company shall have no further obligation or liability to the Executive, other than for any Final Compensation due to the Executive. Other than business expenses described in Section 5(a)(iv), Final Compensation shall be paid to the Executive within thirty (30) days following the date of termination of employment.

        (d)    By the Company Other Than for Cause. The Company may terminate the Executive's employment hereunder other than for Cause (and not due to death or disability) at any time upon notice to the Executive. In the event of such termination, in addition to any Final Compensation due to the Executive, the Company will (i) pay the Executive severance pay, at the same rate as the Base Salary, for the period of twelve (12) months following the date of termination of his employment, (ii) pay the Executive a cash bonus in an amount equal to the cash bonus, if any, paid to the Executive by the Company for the immediately preceding fiscal year and (iii) pay the Executive a prorated annual bonus, if any, for the period during the year of termination during which the Executive was employed, in an amount determined in accordance with Section 4(b) pursuant to the applicable bonus plan (collectively, the "Severance Benefits"). The Company shall also pay the Executive any Final Compensation due him (other than business expenses described in Section 5(a)(iv)) in a lump sum within thirty (30) days following the date of the termination of employment. Any obligation of the Company to provide the Severance Benefits is conditioned, however, on the Executive signing and returning to the Company (without revoking) a timely and effective release of claims in the form provided by the Company (the "Release of Claims"), and such Release of Claims becoming effective pursuant to its terms, and on the Executive's continued compliance with the obligations of the Executive to the Company and its Affiliates that survive termination of his employment, including, without limitation, under Sections 7, 8 and 9 of this Agreement. Subject to Section 5(g) below, any severance pay and bonus described in Section 5(d)(ii) to which the Executive is entitled hereunder shall be in the form of salary continuation, payable in accordance with the normal

payroll practices of the Company for its executives, with the first payment, which shall be retroactive to the day immediately following the date the Executive's employment terminated, being due and payable on the Company's next regular payday for executives that follows the Release of Claims becoming effective pursuant to its terms. Any prorated bonus described in Section 5(d)(iii) shall be payable at such time when bonuses are payable to executives of the Company generally. The Release of Claims required for Severance Benefits in accordance with this Section 5(d) creates legally binding obligations on the part of the Executive and the Company therefore advises the Executive to seek the advice of an attorney before signing the Release of Claims.

(e)    By the Executive for Good Reason. The Executive may terminate his employment hereunder for Good Reason at any time, provided, however, that, within thirty (30) days of the Company's act or omission giving rise to a termination by the Executive for Good Reason, the Executive notifies the Company in writing of the act or omission in accordance with Section 17 of this Agreement, the Company fails to correct the act or omission within thirty (30) days after receiving the Executive's written notice and the Executive actually terminates his employment within sixty (60) days after the date the Company receives the Executive's notice. The following, if occurring without the Executive's consent, shall constitute "Good Reason":

(i)    a material reduction in the Executive's Base Salary;

(ii)    a material diminution in the Executive's responsibilities or duties as Regional President of the Company or Arctic Glacier Canada Inc.;

(iii)    the assignment of duties to the Executive materially inconsistent with his position as Regional President of the Company or Arctic Glacier Canada Inc.; or

(iv)    the Company's material breach of this Agreement.

In the event of such termination, in addition to any Final Compensation due to the Executive, the Company will provide the Executive with the same payments and benefits to which the Executive would be entitled under Section 5(d) of this Agreement on a termination of the Executive's employment by the Company other than for Cause, subject to delivery by the Executive of a Release of Claims as required by Section 5(d) of this Agreement. Other than business expenses described in Section 5(a)(iv), Final Compensation shall be paid to the Executive within thirty (30) days following the date of termination of employment.

(f)    By the Executive Other Than for Good Reason. The Executive may terminate his employment hereunder other than for Good Reason at any time upon ninety (90) days' prior written notice to the Company. In the event of termination of the Executive's employment in accordance with this Section 5(f), the Company may elect to waive the period of notice, or any portion thereof, and, if the Company so elects, the Company will pay the Executive the Base Salary for the period so waived. The Company shall also pay the Executive any Final Compensation due him (other than business expenses described in Section 5(a)(iv)) in a lump sum within thirty (30) days following the date of the termination of employment.

6

(g)    Timing of Payments and Section 409A.

(i)    Notwithstanding anything to the contrary in this Agreement, if at the time of the Executive's termination of employment, the Executive is a "specified employee," as defined below, any and all amounts payable under this Section 5 on account of such separation from service that constitute deferred compensation, and would (but for this provision) be payable within six (6) months following the date of termination, shall instead be paid on the next business day following the expiration of such six (6) month period or, if earlier, upon the Executive's death; except (A) to the extent of amounts that do not constitute a deferral of compensation within the meaning of Treasury Regulation Section 1.409A-1(b) (including, without limitation, by reason of the safe harbor set forth in Section 1.409A-1(b)(9)(iii), as determined by the Company in its reasonable good faith discretion); (B) benefits that qualify as exempted welfare benefits pursuant to Treasury Regulation Section 1.409A-1(a)(5); or (C) other amounts or benefits that are not subject to the requirements of Section 409A of the Internal Revenue Code, as amended (including the regulations thereunder, "Section 409A").

(ii)    For purposes of this Agreement, all references to "termination of employment" and correlative phrases shall be construed to require a "separation from service" (as defined in Section 1.409A-1(h) of the Treasury Regulations after giving effect to the presumptions contained therein), and the term "specified employee" means an individual determined by the Company to be a specified employee under Treasury Regulation Section 1.409A-1(i).

(iii)    Each payment made under this Agreement shall be treated as a separate payment and the right to a series of installment payments under this Agreement is to be treated as a right to a series of separate payments.

(iv)    Any reimbursement for expenses that would constitute nonqualified deferred compensation subject to Section 409A shall be subject to the following additional rules: (A) no reimbursement of any such expense shall affect the Executive's right to reimbursement of any such expense in any other taxable year; (B) reimbursement of the expense shall be made, if at all, promptly, but not later than the end of the calendar year following the calendar year in which the expense was incurred; and (C) the right to reimbursement shall not be subject to liquidation or exchange for any other benefit.

(v)    In no event shall the Company have any liability relating to the failure or alleged failure of any payment or benefit under this Agreement to comply with, or be exempt from, the requirements of Section 409A.

(h)    Exclusive Right to Severance. The Executive agrees that the Severance Benefits to be provided to him in accordance with the terms and conditions set forth in this Agreement are intended to be exclusive. The Executive hereby knowingly and voluntarily waives any right he might otherwise have to participate in or receive benefits under any other plan, program or policy of the Company providing for severance or termination pay or benefits. The Executive also agrees that the Severance Benefits shall be reduced by any other payments or benefits to which the Executive is entitled under applicable law as a result of termination of his employment, including without limitation any federal, state or local law with respect to plant closings, mass layoffs or group benefit plan continuation following termination or the like,

7

exclusive only of any right to unemployment insurance benefits to which the Executive may be entitled under applicable law.

(i)     Termination of Employment Applies to All Positions. Any termination of the Executive's employment shall result in the Executive's automatic resignation from all positions (whether as an officer, employee or in any other capacity) with the Company, Holdings and all of the direct and indirect subsidiaries of Holdings.

6.     Effect of Termination. The provisions of this Section 6 shall apply to any termination of the Executive's employment under this Agreement, pursuant to Section 5 or otherwise.

(a)     Provision by the Company of Final Compensation and Severance Benefits, if any, that are due to the Executive, in each case, under the applicable termination provision of Section 5 shall constitute the entire obligation of the Company to the Executive. The Executive shall promptly give the Company notice of all facts necessary for the Company to determine the amount and duration of its obligations in connection with any termination pursuant to Section 5 hereof.

(b)     Except for any right of the Executive to continue medical and dental plan participation in accordance with applicable law, the Executive's participation in all employee benefit plans of the Company shall terminate pursuant to the terms of the applicable plan documents based on the date of termination of the Executive's employment without regard to any Base Salary for notice waived pursuant to Section 5(f) hereof or to any Severance Benefits or other payment made to or on behalf of the Executive following such date of termination.

(c)     Provisions of this Agreement shall survive any termination of the Executive's employment if so provided herein or if necessary or desirable fully to accomplish the purposes of other surviving provisions, including, without limitation, the obligations of the Executive under Sections 7, 8 and 9 hereof. The obligation of the Company to provide Severance Benefits hereunder, and the Executive's right to retain such payments, is expressly conditioned on the Executive's continued full performance in accordance with Sections 7, 8 and 9 hereof. The Executive recognizes that, except as expressly provided in Section 5(d) or with respect to Base Salary paid for notice waived pursuant to Section 5(f) hereof, no compensation is earned after termination of employment.

7.     Confidential Information.

(a)     The Executive acknowledges that the Company and its Affiliates continually develop Confidential Information, that the Executive may develop Confidential Information for the Company or its Affiliates and that the Executive may learn of Confidential Information during the course of employment. The Executive agrees that all Confidential Information which the Executive creates or to which he has access as a result of his employment or other associations with the Company or any of its Affiliates is and shall remain the sole and exclusive property of the Company or its Affiliate, as applicable. The Executive shall comply with the policies and procedures of the Company and its Affiliates for protecting Confidential Information and shall never disclose to any Person (except as required by applicable law or for the

proper performance of his duties and responsibilities to the Company and its Affiliates), or use for his own benefit or gain or the benefit or gain of any other Person, any Confidential Information obtained by the Executive incident to his employment or any other association with the Company or any of its Affiliates. The Executive understands that this restriction shall continue to apply after his employment terminates, regardless of the reason for such termination. Further, the Executive agrees to furnish prompt notice to the Company of any required disclosure of Confidential Information sought pursuant to subpoena, court order or any other legal process or requirement, and agrees to provide the Company a reasonable opportunity to seek protection of the Confidential Information prior to any such disclosure. The confidentiality obligation under this Section 7 shall not apply to information that has become generally known through no wrongful act on the part of the Executive or any other Person having an obligation of confidentiality to the Company or any of its Affiliates.

(b)     All documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company or any of its Affiliates and any copies or derivatives (including, without limitation, electronic), in whole or in part, thereof (the "Documents"), whether or not prepared by the Executive, shall be the sole and exclusive property of the Company and its Affiliates. Except as required for the proper performance of the Executive's regular duties for the Company or as expressly authorized in writing in advance by the Board or its expressly authorized designee, the Executive will not copy any Documents or remove any Documents or copies or derivatives thereof from the premises of the Company. The Executive shall safeguard all Documents and shall surrender to the Company at the time his employment terminates, and at such earlier time or times as the Board or its designee may specify, all Documents and other property of the Company or any of its Affiliates and all documents, records and files of the customers and other Persons with whom the Company or any of its Affiliates does business ("Third-Party Documents," and each individually, a "Third-Party Document") then in the Executive's possession or control; provided, however, that if a Document or Third-Party Document is on electronic media, the Executive may, in lieu of surrendering the Document or Third-Party Document, provide a copy to the Company on electronic media and delete and overwrite all other electronic media copies thereof. The Executive also agrees that, upon request of any duly authorized officer of the Company, the Executive shall disclose all passwords and passcodes necessary or desirable to enable the Company or any of its Affiliates or the Persons with whom the Company or any of its Affiliates do business to obtain access to the Documents and Third-Party Documents. Anything to the contrary notwithstanding, nothing in this Section 7(b) shall prevent the Executive from retaining a home computer that is his personal property (provided all Confidential Information has been removed), papers and other materials of a personal nature, including diaries, calendars, contact databases and Rolodexes, information relating to his compensation or relating to reimbursement of expenses, information that may be needed for tax purposes, and copies of plans, programs and agreements relating to his employment.

(c)     Nothing in this Agreement or any other agreement between the parties or any other policies of the Company or its Affiliates shall prohibit or restrict the Executive or the Executive's attorneys from: (a) making any disclosure of relevant and necessary information or documents in any action, investigation, or proceeding relating to this Agreement, or as required by law or legal process, including with respect to possible violations of law; or (b) participating, cooperating, or testifying in any action, investigation, or proceeding with, or providing information to, any governmental agency or legislative body, any self-regulatory organization, and/or pursuant

9

to the Sarbanes-Oxley Act. The Executive specifically understands that nothing contained in this Agreement limits the Executive's ability to file a charge or complaint with the Securities and Exchange Commission ("SEC"). The Executive further understands that this Agreement does not limit the Executive's ability to communicate with the SEC or otherwise participate in any investigation or proceeding that may be conducted by the SEC, including providing documents or other information, without notice to the Company. This Agreement does not limit the Executive's right to receive an award for information provided to the SEC. In addition, nothing in this Agreement or any other agreement between the parties or any other policies of the Company or its affiliates prohibits or restricts the Executive from initiating communications with, or responding to any inquiry from, any regulatory or supervisory authority regarding any good faith concerns about possible violations of law or regulation. The parties specifically acknowledge that 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(i) is made—(A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, notwithstanding anything to the contrary in the foregoing, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law.

8.    Assignment of Rights to Intellectual Property. The Executive shall promptly and fully disclose all Intellectual Property to the Company. The Executive hereby assigns and agrees to assign to the Company (or as otherwise directed by the Company) the Executive's full right, title and interest in and to all Intellectual Property. The Executive agrees to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including, without limitation, the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Intellectual Property to the Company and to permit the Company to enforce any patents, copyrights or other proprietary rights to the Intellectual Property. The Executive will not charge the Company for time spent in complying with these obligations. All copyrightable works that the Executive creates shall be considered "works made for hire" and shall, upon creation, be owned exclusively by the Company.

9.    Restricted Activities. The Executive agrees that the following restrictions on his activities during and after his employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company and its Affiliates:

(a)    While the Executive is employed by the Company and for a period of twenty-four (24) months after his employment terminates, regardless of the basis or timing of that termination, (the "Non-Competition Period"), the Executive shall not, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, compete with the Company or any of its Affiliates or undertake any planning for any business competitive with the Business of the Company or any of its Affiliates within any geographic area in which the Company or any of its Affiliates conduct their business (the "Restricted Area"). Specifically, but without limiting the foregoing, the Executive agrees not to engage in any manner in any activity that is directly or indirectly competitive or potentially competitive with the Business

10

of the Company or any of its Affiliates, as conducted or under consideration at any time during the Executive's employment, within the Restricted Area and further agrees not to work for or provide services, in any capacity, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Person who is engaged in any business that is competitive with the Business of the Company or any of its Affiliates for which the Executive has provided services, as conducted or in planning during his employment, within the Restricted Area. For the purposes of this Section 9, the Business of the Company and its Affiliates shall mean the business of manufacturing and distributing packaged ice and related products (including, without limitation, ice-related equipment and technology) (the "Business"), and shall include all Products and all items, products and services that may be used in substitution for Products. The foregoing, however, shall not prevent the Executive's passive ownership of three percent (3%) or less of the equity securities of any publicly traded company.

(b)    The Executive agrees that, during his employment with the Company, he will not undertake any outside activity, whether or not competitive with the Business of the Company or its Affiliates, that could reasonably give rise to a conflict of interest or otherwise interfere with any of his duties or obligations to the Company or any of its Affiliates.

(c)    The Executive agrees that, during his employment and during the Non-Competition Period, he will not directly or indirectly (i) solicit or encourage any customer of the Company or any of its Affiliates to terminate or diminish its relationship with them; or (ii) seek to persuade any such customer or any prospective customer of the Company or any of its Affiliates to conduct with anyone else any business or activity which such customer or prospective customer conducts or could conduct with the Company or any of its Affiliates; provided that these restrictions shall apply during the Non-Competition Period (A) only with respect to those Persons who are or have been a customer of the Company or any of its Affiliates at any time within the immediately preceding two (2)-year period or whose business has been solicited on behalf of the Company or any of the Affiliates by any of their officers, employees or agents within said two (2)-year period, other than by form letter, blanket mailing, blanket electronic solicitation or published advertisement, and (B) only if the Executive has performed work for such Person during his employment with the Company or one of its Affiliates or been introduced to, or otherwise had contact with, such Person as a result of his employment or other associations with the Company or one of its Affiliates or has had access to Confidential Information that would assist in the Executive's solicitation of such Person.

(d)    The Executive agrees that during his employment (excluding any activities undertaken on behalf of the Company or any of its Affiliates in the course of his duties) and during the Non-Competition Period, the Executive will not, and will not assist any other Person to, (i) solicit for hiring any employee of the Company or any of its Affiliates or seek to persuade any employee of the Company or any of its Affiliates to discontinue employment or (ii) solicit or encourage any independent contractor providing services to the Company or any of its Affiliates to terminate or diminish its relationship with them; provided, however, that during the Non-Competition Period, these restrictions shall apply only to employees and independent contractors who have provided services to the Company at any time within the two (2) years preceding the date of termination of the Executive's employment.

11

(e)    Subject to the Section 7(c) hereof, the Executive hereby covenants and agrees that the Executive shall not, directly or indirectly, make, publish or communicate (or cause to be made, published or communicated) any defamatory or disparaging statement (whether written or oral) concerning or related to the Company and its parents, subsidiaries and Affiliates, including, but not limited to, its and their current or former directors, officers, members, partners, employees, direct or indirect owners, representatives, customers, clients, suppliers, investors and other associated third parties, or its or their businesses, business practices, prospects, products or services, in any respect.

10.    Enforcement of Covenants. The Executive acknowledges that he has carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed upon him pursuant to Sections 7, 8 and 9 hereof. The Executive agrees without reservation that each of the restraints contained herein is necessary for the reasonable and proper protection of the goodwill, Confidential Information and other legitimate interests of the Company and its Affiliates; that each and every one of these restraints is reasonable in respect to subject matter, length of time and geographic area; and that these restraints, individually or in the aggregate, will not prevent him from obtaining other suitable employment during the period in which the Executive is bound by them. The Executive further agrees that he will never assert, or permit to be asserted on his behalf, in any forum, any position contrary to the foregoing. The Executive further acknowledges that, were he to breach any of the covenants contained in Sections 7, 8 or 9 hereof, the damage to the Company would be irreparable. The Executive therefore agrees that the Company, in addition to any other remedies available to it, shall be entitled to apply for preliminary and permanent injunctive relief against any breach or threatened breach by the Executive of any of said covenants, without having to post bond, and will additionally be entitled to an award of attorney's fees incurred in connection with securing any relief hereunder. Without limiting the generality of the foregoing, the Executive agrees that, in the event of his breach of any provision of Sections 7, 8 or 9 hereof, the Company and its Affiliates shall have the immediate right to cause to be cancelled, rescinded, terminated, or otherwise limited or restricted, any restricted stock units and/or stock options that have been awarded to him by the Company or any of its Affiliates; provided, however, that the parties acknowledge and agree that any such action with respect to the restricted stock units and/or stock options will not alone be an adequate remedy and will not limit or prevent the Company and its Affiliates from seeking any other remedies available to them (including without limitation preliminary and permanent injunctive relief). The parties further agree that, in the event that any provision of Sections 7, 8 or 9 hereof shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. The Executive agrees that the Non-Competition Period shall be tolled, and shall not run, during any period of time in which he is in violation of the terms thereof, in order that the Company and its Affiliates shall have all of the agreed-upon temporal protection recited herein. No breach of any provision of this Agreement by the Company, or any other claimed breach of contract or violation of law, or change in the nature or scope of the Executive's employment relationship with the Company, shall operate to extinguish the Executive's obligation to comply with Sections 7, 8 and 9 hereof.

11.    No Conflicting Agreements. The Executive hereby represents and warrants that the execution of this Agreement and the performance of his obligations hereunder will not breach or be in conflict with any other agreement to which the Executive is a party or is bound and that the

12

Executive is not now subject to any covenants against competition or similar covenants or any other obligations to any Person or to any court order, judgment or decree that would affect the performance of his obligations hereunder. The Executive will not disclose to or use on behalf of the Company any proprietary information of a third party without such party's consent.

12.    <u>Definitions</u>. Capitalized words or phrases shall have the meanings provided in this Section 12 and as provided elsewhere herein:

(a)    "<u>Affiliate</u>" means any person or entity directly or indirectly controlling, controlled by or under common control with the Company, where control may be by either management authority or equity interest. For the avoidance of doubt, Affiliates does not include any other portfolio company of any investment fund associated with Carlyle Investment Management LLC other than the Company and its direct and indirect parents and subsidiaries.

(b)    "<u>Confidential Information</u>" means any and all information of the Company and its Affiliates that is not generally known by Persons with whom they compete or do business, or with whom they plan to compete or do business, and any and all information, publicly known in whole or in part or not, which, if disclosed by the Company or any of its Affiliates, would assist in competition against them. Confidential Information includes, without limitation, such information relating to (i) the development, research, testing, manufacturing, marketing and financial activities of the Company and its Affiliates, (ii) the Products, (iii) the costs, sources of supply, financial performance and strategic plans of the Company and its Affiliates, (iv) the identity and special needs of the customers of the Company and its Affiliates and (v) the people and organizations with whom the Company and its Affiliates have business relationships and the nature and substance of those relationships. Confidential Information also includes information that the Company or any of its Affiliates has received, or may receive hereafter, belonging to others or that was received by the Company or any of its Affiliates with any understanding, express or implied, that it would not be disclosed.

(c)    "<u>Intellectual Property</u>" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by the Executive (whether alone or with others, whether or not during normal business hours or on or off Company premises) during the Executive's employment and during the period of six (6) months immediately following termination of his employment that relate either to the Products or to any prospective activity of the Company or any of its Affiliates or that result from any work performed by the Executive for the Company or any of its Affiliates or that make use of Confidential Information or any of the equipment or facilities of the Company or any of its Affiliates.

(d)    "<u>Person</u>" means a natural person, a corporation, a limited liability company, an association, a partnership, an estate, a trust and any other entity or organization, other than the Company or any of its Affiliates.

(e)    "<u>Products</u>" means all products planned, researched, developed, tested, sold, licensed, leased or otherwise distributed or put into use by the Company or any of its Affiliates,

13

together with all services provided or otherwise planned by the Company or any of its Affiliates, during the Executive's employment.

13.  Withholding. All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law.

14.  Assignment. Neither the Company nor the Executive may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other; provided, however, that the Company may assign its rights and obligations under this Agreement without the consent of the Executive in the event that the Company shall hereafter effect a reorganization, consolidate with, or merge into, an Affiliate or any Person or transfer all or substantially all of its properties, stock or assets to an Affiliate or any Person. This Agreement shall inure to the benefit of and be binding upon the Company and the Executive, and their respective successors, executors, administrators, heirs and permitted assigns.

15.  Severability. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

16.  Waiver. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party. The failure of either party to require the performance of any term or obligation of this Agreement, or the waiver by either party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

17.  Notices.  Any and all notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered in person, consigned to a reputable national courier service or deposited in the United States mail, postage prepaid, registered or certified, and addressed to the Executive at his last known address on the books of the Company or, in the case of the Company, at its principal place of business, attention of the Board, or to such other address as either party may specify by notice to the other actually received.

18.  Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes and terminates all prior communications, agreements and understandings, written or oral, with respect to the terms and conditions of the Executive's employment with the Company.

19.  Amendment. This Agreement may be amended or modified only by a written instrument signed by the Executive and by an expressly authorized representative of the Company.

20.  Headings. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

14

21.     <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

22.     <u>Governing Law; Jury Trial Waiver</u>. This is a Delaware contract and shall be construed and enforced under and be governed in all respects by the laws of the State of Delaware, without regard to the conflict of laws principles thereof. In the event of any alleged breach or threatened breach of this Agreement, the parties hereby consent and submit to the jurisdiction of the federal and state courts in and of the State of Delaware and to service of legal process in the State of Delaware. Without limiting the generality of the foregoing, each of the parties hereto irrevocably and unconditionally waives all right to trial by jury in any proceeding (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the Executive's employment by the Company.

*[Remainder of page intentionally left blank.]*

15

IN WITNESS WHEREOF, this Agreement has been executed as a sealed instrument by the Company by its duly authorized representative, and by the Executive, effective as of the Effective Date.

THE EXECUTIVE:                          THE COMPANY:

                                        ARCTIC GLACIER U.S.A., INC.

                                        By: _____
By: _____             Title: _____
John Harrison

16

# EXHIBIT B

**Monday, April 8, 2024 at 13:53:31 Eastern Daylight Time**

---

**Subject:** Discussion Recap 4/4/2024
**Date:**     Thursday, April 4, 2024 at 9:54:57 AM Eastern Daylight Time
**From:**     John Harrison
**To:**       Peter Laport

Pete,

Thank you for our conversation today. I appreciate that we have a relationship that allows us to discuss the impacts of various decisions / changes that are made, especially when I am confronted with the reduction of my responsibility for the company Sales organization. This diminution of my responsibilities has concerned me as we discussed and as a result over the past week I have had to strongly consider my future with Artic Glacier and as we discussed the execution of the option to exit with my benefits. As I mentioned I wanted to talk through this with you as I believe that working together on my professional exit and transition is the best option for all and I apricated your commitment on the call this morning on executing such. As we agreed, it is in both parties best interest to mutually work together on such exit.

Thank You,

John

# EXHIBIT C

**Thursday, April 18, 2024 at 11:10:57 Eastern Daylight Time**

---

**Subject:**  Re: Documents
**Date:**  Thursday, April 18, 2024 at 9:12:41 AM Eastern Daylight Time
**From:**  John Harrison
**To:**  Peter Laport
**Attachments:** image001.png

Ok, just so there is no confusion, you're accepting that email communication is an acceptable address to communicate with as I do not have a mailing address for Elise or you.

# John Harrison

Chief Operating Officer

www.arcticglacier.com



| Cell | **603-484-3236** |
| Email | **JHarrison@arcticglacier.com** |
| Website | **arcticglacier.com** |

On Apr 18, 2024, at 8:46 AM, Peter Laport <PLaport@arcticglacier.com> wrote:

John – please direct all correspondence to Elise & I.

Thanks,
Pete

**Peter Laport**
**Chief Executive Officer**
<image001.png>

**plaport@arcticglacier.com I Arcticglacier.com**
**Mobile: 410-241-0705**
**The content of this email is confidential and intended for the recipient specified in the message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.**

**From:** John Harrison <JHarrison@ArcticGlacier.com>
**Date:** Wednesday, April 17, 2024 at 8:13 PM

**1 of 3**

**To:** Peter Laport <PLaport@arcticglacier.com>
**Subject:** Re: Documents

Good Evening Pete,

I know we have call scheduled for Friday as a follow up. I am hopeful that we continue to resolve this as we first discussed. It seemed on the call yesterday that Elise had several questions, hopefully they have been resolved.

Again I truly do believe that both of us do not want or intend for conflict. Because there were questions raised yesterday, I do need to make sure that I have the correct address to use for any notices, such as outlined in section 17.  Our company's current address is 307 23rd St. Ext Ste 950, DPT#EXPA1183, Sharpsburg, PA.

I do want to make sure we maintain the confidentiality as we discussed and would there be a better or different address I should use? Something that would be more secure and directly to you?

Thank you,

John

---

**From:** Elise Doyle <edoyle@ArcticGlacier.com>
**Date:** Tuesday, April 16, 2024 at 3:51 PM
**To:** Peter Laport <PLaport@arcticglacier.com>, John Harrison <JHarrison@ArcticGlacier.com>
**Subject:** Documents


## Elise Doyle

Chief Human Resources Officer

Image removed by sender.

?

| Cell | **267-721-3818** |
| Email | **EDoyle@ArcticGlacier.com** |
| Website | **arcticglacier.com** |

The content of this email is confidential and intended for the recipient specified in the message only. It is strictly forbidden to share any part of this message with any third party, without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so

that we can ensure such a mistake does not occur in the future.

EFiled: Sep 03 2024 04:41PM EDT
Transaction ID 74217935
Case No. N24C-09-014 CEB

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| JOHN HARRISON, | * | C.A. No. _____ |
| | * | |
| *Plaintiff*, | * | |
| | * | |
| v. | * | |
| | * | |
| ARCTIC GLACIER U.S.A., INC., | * | |
| | * | |
| *Defendant*. | * | |
| | * | |

## <u>PRAECIPE</u>

To:     Prothonotary
        New Castle County Courthouse
        500 North King Street
        Wilmington, DE  19801

        PLEASE ISSUE a writ of summons directed to the New Castle County Sheriff to serve process upon the Defendant, by serving a copy of the Summons together with a copy of the Complaint, and any other documents or papers requiring service herein upon the Defendant at the following address:

        Arctic Glacier U.S.A., Inc.
        c/o The Corporation Trust Company
        1209 Orange Street
        Wilmington, DE 19801.

                          **LAW OFFICE OF
                          DANIEL C. HERR LLC**

Dated:  September 3, 2024      */s/Daniel C. Herr*
                               Daniel C. Herr (No. 5497)
                               3411 Silverside Road
                               The Baynard Building
                               Wilmington, DE 19810
                               302-483-7090
                               dherr@dherrlaw.com
                               *Attorney for Plaintiff*

EFiled: Sep 03 2024 04:41PM EDT
Transaction ID 74217935
Case No. N24C-09-014 CEB

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN HARRISON, | * | C.A. No. _____ |
| | * | |
| *Plaintiff*, | * | |
| | * | |
| v. | * | |
| | * | |
| ARCTIC GLACIER U.S.A., INC., | * | |
| | * | |
| *Defendant*. | * | |
| | * | |

## SUMMONS

**THE STATE OF DELAWARE,
DIRECTED TO THE NEW CASTLE COUNTY SHERIFF**

**YOU ARE COMMANDED:**

To summons the following Defendant, ARCTIC GLACIER U.S.A., INC., so within 20 days after service hereof upon Defendant, exclusive of the day of service, Defendant shall serve upon Daniel C. Herr, Esq., Plaintiff's Attorney, whose address is 3411 Silverside Road, The Baynard Building, Wilmington, DE 19810, an Answer to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

To serve upon Defendant a copy hereof, of the Complaint (and an Affidavit of Demand, if any has been filed by Plaintiff), Answers to Form 30 Interrogatories, and any other documents required to be served.

<u>COLLEEN REDMOND</u>
**Prothonotary**

_____

**Dated:**
Per Deputy

**TO THE ABOVE-NAMED DEFENDANT(S):**

1

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's Attorney named above an Answer to the Complaint (and, if an Affidavit of Demand has been filed, and Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

<u>COLLEEN REDMOND</u>
**Prothonotary**

_____
**Per Deputy**

2

# EXHIBIT 2



**So Ordered**

/s/ Charles E Butler    Oct 04, 2024

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

JOHN HARRISON,                    )
                                  )
     Plaintiff,           )
                                  )
     v.                   )    C.A. No. N24C-09-014 CEB
                                  )
ARCTIC GLACIER U.S.A,             )
INC.,                             )
                                  )
     Defendant.           )
_____   )

### STIPULATION AND [PROPOSED] ORDER

The parties stipulate and agree, subject to approval of the Court, that Defendant Arctic Glacier, U.S.A., Inc. ("Defendant") agrees to accept service of the Summons and Plaintiff John Harrison's Complaint as of October 1, 2024, and the time for Defendant to move, answer, or otherwise respond to the Complaint is extended to and including October 30, 2024.

**LAW OFFICE OF DANIEL C. HERR LLC**

  /s/ Daniel C. Herr
Daniel C. Herr (#5497)
3411 Silverside Road
The Baynard Building
Wilmington, DE 19810
(302) 483-7060
dherr@dherrlaw.com

*Counsel for Plaintiff John Harrison*

**BLANK ROME LLP**

  /s/ Anna E. Currier
Adam V. Orlacchio (#5520)
Anna E. Currier (#6271)
1201 N. Market St., Suite 800
Wilmington, DE 19801
(302) 425-6431
adam.orlacchio@blankrome.com
anna.currier@blankrome.com

*Counsel for Defendant Arctic Glacier U.S.A., Inc.*

APPROVED and SO ORDERED this_____of_____, 2024.

_____
The Honorable Charles E. Butler

| This document constitutes a ruling of the court and should be treated as such. | |
|---|---|
| **Court:** | DE Superior Court-New Castle County |
| **Judge:** | Charles E Butler |
| **Current Date:** | Oct 04, 2024 |
| **Case Number:** | N24C-09-014 CEB |
| **Court Authorizer:** | Charles E Butler |

**/s/ Judge Charles E Butler**